IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEATHER SOLOMON, | ) |
|           Plaintiff, | ) |
| vs | ) Civil Action No. 2:21-1750 |
| | ) Magistrate Judge Dodge |
| ANTHONY PARENTE, | ) |
|           Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff Heather Solomon brings this action against Defendant Anthony Parente ("Trooper Parente"), a law enforcement officer employed by the Pennsylvania State Police ("PSP"). She alleges that he denied her the equal protection of the law based on her gender when he failed to respond to her repeated requests for help after her estranged husband, William Solomon II ("Solomon") violated a protection from abuse order ("PFA").

Currently pending before the Court is Defendant's motion for summary judgment. For the reasons that follow, the motion will be denied.[1]

**I.  Procedural History**

Plaintiff commenced this action on December 1, 2021. Federal question jurisdiction is based on the § 1983 civil rights claim in Count I, 28 U.S.C. §§ 1331, 1343(3). Count I asserts a Fourteenth Amendment equal protection claim.

The Complaint also named Solomon as a defendant and asserted claims against him for intentional infliction of emotional distress (Count II), trespass (Count III) and assault and battery (Count IV). By Memorandum Opinion and Order filed on July 26, 2022 (ECF Nos. 27, 28),

---

[1] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (ECF Nos. 21, 25)

Solomon's motion to dismiss was granted and he was dismissed as a defendant in the case. Therefore, only Count I, the equal protection claim against Trooper Parente, remains to be resolved.

On December 4, 2023, Defendant filed a motion for summary judgment (ECF No. 55), which has been fully briefed (ECF Nos. 56, 67, 71).

**II.   Relevant Factual Background[2]**

At the time of the events herein, Plaintiff was married to Solomon, the father of her infant son. Plaintiff and Solomon were separated as of June 12, 2020, and their divorce was finalized in November of 2022. Plaintiff was living in the marital residence in Brownsville, Pennsylvania. (Defendant's Statement of Material Facts Not in Dispute ("DSMF") ¶¶ 2-4; Plaintiff's Counterstatement of Material Facts ("PCSMF") ¶¶ 2-4.)[3]

A. Events Leading to Plaintiff's First Encounter with Trooper Parente

On or about July 27, 2020, Judge Linda Cordaro of the Fayette County Court of Common Pleas granted a final PFA that directed Solomon not to "abuse, harass, stalk, threaten, or attempt or threaten to use physical force against Plaintiff" and ordered that he "shall not contact [her] . . . by telephone or any other means, including third persons." (DSMF ¶ 5; PCSMF ¶¶ 5, 54.) The order further provided that in the event of a violation, an arrest can be made based solely on probable cause without the necessity of a warrant and need not be in the presence of a law enforcement officer. (PCSMF ¶¶ 13, 55.)

On November 28, 2020, Solomon sent Plaintiff an email which she reported to the PSP. Trooper Zachary Casini was dispatched to Plaintiff's home and viewed Plaintiff's cell phone and

---

[2] There are a number of disputed facts in the record, only some of which are relevant to the Court's analysis. For that reason, the Court will provide a detailed summary of the disputed facts only as necessary.
[3] ECF No. 57; ECF No. 65.

2

the email from Solomon. Trooper Casini informed Plaintiff that he "would attempt to make contact and arrest" Solomon. Trooper Casini attempted to contact Solomon but was unsuccessful. Trooper Casini then charged Solomon for violating the PFA and issued a warrant for his arrest. Solomon was later found guilty at a trial in December 2022. (PCSMF ¶ 57.)[4]

Plaintiff received another email from Solomon's email address on December 1, 2020. It stated: "Where is [Plaintiff's minor child"]? The email attached three photographs taken from across the street from her residence which showed her placing her children into her car. (PCSMF ¶ 58; DSMF ¶¶ 12, 14.)[5] Plaintiff attempted to report this incident to Brownsville Police, but no one was available to take her report. As a result, Plaintiff went to the PSP barracks in Belle Vernon, where she reported the email contact by Solomon to Trooper Parente. (DSMF ¶¶ 10-11; PCSMF ¶ 58.)[6] Plaintiff also showed Trooper Parente a copy of the PFA and told him about other incidents in which Solomon threatened and stalked her. (PCSMF ¶¶ 59, 61.)

Plaintiff states that Trooper Parente testified that he reviewed the relevant PFA and was aware that Solomon was not permitted to contact her, either directly or indirectly. He stated, however, that "I also have to prove that Mr. Solomon . . . was sending these emails himself physically, and I have to take that case to court." (PCSMF ¶¶ 79-80.) Trooper Parente claims that he did not perceive the photographs attached to the email to as threatening. (PCSMF ¶ 60.)

---

[4] In Defendant's Response to Plaintiff's Statement of Additional Material Facts (ECF No. 72), he "disputes" Plaintiff's statement about this incident (DRPSAMF ¶ 57), but his reference is to his own deposition testimony regarding the conflicting reports he claimed to have received about the *December 1, 2020 incident*, as described herein. Defendant's Concise Statements do not address the November 28 incident. Thus, Plaintiff's description of this incident is undisputed.

[5] Defendant's version of what Plaintiff reported about the contents of the email—namely that it "asked questions concerning her infant son" (DSMF ¶ 14)—is not supported by the subsequently issued investigative report and downplays the underlying threat expressed in the message.

[6] Trooper Parente has been employed as a state trooper since 2019. During the times relevant to this action, Trooper Parente was assigned to Troop B, working at the Belle Vernon Station in Westmoreland County, Pennsylvania. (DSMF ¶¶ 6-7.)

Plaintiff also tried to show Trooper Parente a video she had taken on her cell phone of an incident in August 2020, after the issuance of the PFA, during which Solomon arrived at the house with a firearm, and barricaded himself in a room with her infant son. Trooper Parente refused to look at the video because he deemed it to be "irrelevant" to his investigation. (PCSMF ¶¶ 65-66.)[7] According to Plaintiff, he told her: "You have to understand that this is an issue with the PFA and women, not men. Women get PFAs all of the time and they abuse the power of it because they use it as a way to try to get back at an ex." (PCSMF ¶ 70.) Trooper Parente denies making this statement. (DRPSAMF ¶ 70.)

Trooper Parente also utilized the computer-aided dispatch ("CAD"), PSP's "documenting system," during his investigation. CAD identified previous PFA violations between the parties, including the November 28, 2020 PFA violation against Solomon. Trooper Parente did not view these past violations as relevant (PCSMF ¶ 71), and although it would be necessary to read the underlying report to obtain anything other than basic information, he did not do so. In the portion of his investigative report that asks about prior incidents of domestic violence or PFA violations, he provided no detail and merely referred to CAD. (PCSMF ¶¶ 72-74.)

Trooper Parente acknowledges that he had the authority to file criminal charges related to violations of PFA orders but he would sometimes contact the local district attorney's office if he needed guidance. (DSMF ¶¶ 8-9.) Plaintiff disputes that it was necessary for him to consult with

---

[7] While Trooper Parente asserts that this is "not material" (DRPSAMF ¶ 66), among the issues in this case is the nature of Trooper Parente's response to Plaintiff's reports of harassment by Solomon. Notably, John Marshall, who was Fayette County's Chief County Detective at the time and had previously worked for the PSP for 23 years as a criminal investigator, met with Plaintiff in July 2021 and watched the video from the August 2020 incident that Trooper Parente refused to review. Although he did not rely on it for his investigation, he testified that he would never refuse to review such evidence since it would be relevant in a subsequent PFA violation investigation. Detective Marshall charged Solomon with terroristic threats and simple assault and Solomon accepted a plea offer regarding these charges. (PCSMF ¶¶ 67-69.)

4

or obtain approval from the district attorney's office before filing charges for a PFA violation. (PCSMF ¶ 9.)[8]

After meeting with Plaintiff, Trooper Parente opened an investigation and wrote that Plaintiff "report[ed] an alleged PFA Violation between her and her Ex-Husband William SOLOMON." (DSMF ¶ 13; PCSMF ¶ 58.)[9] Trooper Parente then contacted Solomon, who claimed that he did not send the emails. Although he admitted that it was his email address, Solomon claimed that Plaintiff had multiple devices with access to his email address and accused her of sending the emails to herself. (DSMF ¶ 15.) In response to Trooper Parente's inquiry as to why Solomon did not terminate this as his email address if Plaintiff was using it in this manner, Solomon claimed that this was his contact with his employer. Trooper Parente did not conduct an in-person interview of Solomon nor did he ask him to provide a statement. (PCSMF ¶¶ 62-64.)

Because he had what he characterized as conflicting reports, Trooper Parente did not charge Solomon with a PFA violation with respect to the December 1, 2020 email. Rather, he states that he contacted Assistant District Attorney Christina DeMarco for "further guidance" and that she advised that he "should attempt to ascertain a search warrant for the IP address origination source for the email in question." (DSMF ¶¶ 15-17.)[10]

---

[8] Plaintiff states that Fayette County District Attorney Bower told her that he would have acted immediately upon the information she provided to Trooper Parente. Moreover, Trooper Thasic, who is from the same barracks as Trooper Parente, told her that when a PFA violation is reported, they are to file charges "immediately" and depending on the evidence, "they'll drop it or keep it for trial." When she asked Trooper Thasic why the district attorney's office would need to be contacted before charges are filed, he responded "I don't know." (PCSMF ¶¶ 9, 25, 56.)

[9] Plaintiff disputes that this was an "alleged" PFA violation given that the nature of Solomon's email. (PCSMF ¶ 13.)

[10] Plaintiff denies that Trooper Parente had "conflicting reports," citing to the PFA's directive against any contact by Solomon, her own statements, the email and photographs, and the CAD information reflecting prior PFA violations. (PCSMF ¶ 16.)

B. <u>Plaintiff's Report to Trooper Parente on January 2, 2021</u>

According to Plaintiff, she received another email from Solomon on January 2, 2021, in which Solomon threatened to kill her and police officers. The email states: "I'm ending your life sooner than later watch me[.] Oh and fuck officer brandt, I'm trained to kill him to[o] and all the other corrupt cops that you involve in everything . . . die bitch [. . .] I'll remove the brakes from your car when you're sleeping and shoot up your gas tank while you're in it." (PCSMF ¶ 81.)

Plaintiff first attempted to report receipt of this email to the Charleroi Police, her local police agency, but was directed to the Belle Vernon Barracks of the PSP. Plaintiff provided PSP with her name and phone number and indicated that she had to report a PFA violation. (PCSMF ¶ 18.)

Trooper Parente states that he took Plaintiff's statement and opened a second investigation, then contacted Solomon. (DSMF ¶¶ 18-20.) Plaintiff contends that Trooper Parente first contacted Solomon, who denied sending the email and said that he believed Plaintiff was sending them to herself. Trooper Parente then called Plaintiff and told her "I already talked to your ex-husband before I called you just now, and he told me that you have a computer there that is his and he believes that you are emailing yourself." He asked her to bring Solomon's laptop to the PSP barracks. (PCSMF ¶¶ 18-20.) According to Trooper Parente, Plaintiff claimed she didn't have it. (DSMF ¶ 23.) Plaintiff states that she informed Trooper Parente that Solomon left his desktop computer at her residence, not his laptop computer as Solomon had claimed, and Trooper Parente instructed her to bring in his desktop computer. (PCSMF ¶¶ 18, 85.)

Plaintiff brought Trooper Parente the desktop computer per his instruction, but he refused to look at it. Plaintiff testified that Trooper Parente said:

> I am not doing anything about this." He said, "I already contacted the district attorney's office." And he made me do a statement, he is like, "Here, do another

6

written statement." And then he said to me that as soon as he hears something from the district attorney, he will let me know, but he was currently trying to get in touch with I believe Google. He told me, he looked right at me and said, "If I find out that you did this, I am going to arrest you for lying to law enforcement." And that was it. And then he left me sitting there and made me take the computer and left with my 10 month old infant.

(PCSMF ¶¶ 87-89.)

Trooper Parente denies Plaintiff's version of events. (DRPSAMF ¶¶ 87-88.) He states that he refused to take the desktop computer because it did not match Solomon's description of the laptop computer. (DSMF ¶¶ 23-24; PCSMF ¶ 90.)

Trooper Parente did not ask Solomon to attend an in-person interview or to provide a written or recorded statement. He asserts that he does not take written statements from parties if someone refuses to provide a statement, they are "not there," or if there is evidence of physical injury in a domestic violence situation. (PCSMF ¶¶ 20-21.) Further, he did not interpret the January 2, 2021 email as a "direct threat to me or law enforcement," because, "I listen to it every day, all day long at work people say things like that, of that such nature." He admitted, however, that threatening to kill someone can be illegal. (PCSMF ¶¶ 81-82.)

Trooper Parente stated in an attachment to his investigative report regarding the January 2, 2021, email that no weapons were threatened to be used in the incident, which testified was a "clerical mistake." His report also stated that Solomon was not arrested for a PFA violation with respect to either email "pending search warrant for email address." (PCSMF ¶¶ 83-84.)

After January 2, 2021, Plaintiff had no further contact with Trooper Parente. (PCSMF ¶ 115.)

C. Search Warrants

On February 18, 2021, Trooper Parente applied for a warrant to search Plaintiff's residence for an Apple laptop computer belonging to Solomon in order to investigate whether,

7

based on Solomon's allegations, she was making false reports to law enforcement. According to Trooper Parente, he "didn't believe either of the parties involved . . . so I was trying to find the truth." (DRPSAMF ¶ 93.) Requesting a search warrant for a PFA violation was not "normal" or "common practice." (PCSMF ¶ 16.) In the Affidavit of Probable Cause submitted to support the issuance of a search warrant, he wrote, "[Plaintiff] related that [Solomon] has a laptop from their previous marriage in her residence but has not turned it on. When questioned who took the [December 1, 2020 photos], she related that she did not see anyone. The images were taken with no obstructions and was directly across the street from her residence." (PCSMF ¶¶ 93-94.)[11]

Trooper Parente found no evidence that Plaintiff had Solomon's laptop. However, Solomon called him at an unspecified time after the investigation had concluded and said that he went to Plaintiff's house with a constable and collected his laptop computer, which had been "wiped." Trooper Parente did not charge Solomon for going to Plaintiff's residence, which would be a violation of the PFA, because Plaintiff did not report it. (PCSMF ¶¶ 100-01.)

With respect to the issuer of the emails, Trooper Parente sought guidance from ADA DeMarco and was advised to obtain a search warrant to prove who was sending them. (DSMF ¶¶ 25-26, 102; PCSMF ¶ 102.) The first search warrant served on Google expired. A second search warrant was served on Google, and Google responded on March 25, 2021. Trooper Parente states that he could not determine from the information obtained from Google who sent the emails. Therefore, he contacted the D.A.'s office and they recommended that he close the case as there was not enough evidence to proceed to court. (DSMF ¶¶ 27-31.)

---

[11] Trooper Parente did not go to Plaintiff's house to see if there were no obstructions but believed that there were none because he could not see any in the photographs. However, he admitted that he could not tell what was behind the photograph, nor whether the individual taking the photograph was standing behind something. (PCSMF ¶ 96.)

8

> Plaintiff notes that Google responded to the search warrant as follows:
>
> Pursuant to the Search Warrant in the above-referenced matter, we have conducted a diligent search for documents and information accessible on Google's systems that are responsive to your request…Accompanying this letter is responsive information to the extent reasonably accessible from our system associated with the Google account(s) DUNEKOON427@gmail.com, as specified in the Search Warrant. We have also included a signed Certificate of Authenticity which includes a list of hash values that correspond to each file contained in the production.

(PCSMF ¶¶ 30, 103.) On April 27, 2021, Trooper Parente reported that, "A report was received from Google corp detailing the IP address associated with the email account." He testified that he did not know what this information meant but took no steps to obtain any understanding. (PCSMF ¶ 105.) When asked why he did nothing to find the identity of the IP addresses in Google report, he testified, "I was going investigative step by investigative step that I deemed appropriate and then I would talk to the D.A.'s office for further guidance." (PCSMF ¶ 107.) He states that he provided the information received from Google to ADA DeMarco (DSMF ¶ 32) and recommended that the case stay open pending further investigation. (PCSMF ¶ 108.)

Trooper Parente states that he spoke to Fayette County Assistant District Attorney Travis Rhodes on October 22, 2021 and concluded that "[u]nder his advisement, this case will be closed based on the lack of solvability factors present." (DSMF ¶ 33.) According to Plaintiff, this statement is at odds with Trooper Parente's admission that evidentiary information was received from Google. (PCSMF ¶¶ 109-10.) Trooper Parente asserts that he did not pursue criminal charges against Solomon because he could not determine who had sent the emails. (DRPSAMF ¶ 110.)

Trooper Parente acknowledges that normally a PFA violation is filed the day it is reported but described his investigation in this matter as an "outlier" because he had never had a "prolonged PFA violation" like the matter involving the Plaintiff. (PCSMF ¶¶ 113-14.)

9

On or about January 4, 2021, Plaintiff obtained an "Email Audit Report" from Steel City Developers, LLC, which detailed that the January 2, 2021 email was sent from a device at Solomon's address. (PCSMF ¶¶ 116-17.) Plaintiff attempted to give this report to Trooper Casini at the hearing for the November 28, 2020, PFA Violation. However, he indicated that after speaking to "another trooper," he didn't feel it was necessary to see her report. (PCSMF ¶ 118.)

In June, 2021, Plaintiff provided this email report to Fayette County District Attorney Bower, who asked Plaintiff why charges were not filed by the PSP regarding the relevant emails. Plaintiff informed him that Trooper Parente had told her that his investigation had to go through DA Bower's office. DA Bower then told Plaintiff, "No. I can tell you right now I never in a million years would have looked at an email like this or heard a description of an email like this and told somebody not to do something about it . . . Nobody in my office would have said that without it going through me." (PCSMF ¶ 119.)

Solomon was subsequently arrested and confined in the Washington County Jail based on reports Plaintiff had made regarding other alleged PFA violations. Solomon was eventually convicted of these other PFA violations in Washington County. (DSMF ¶¶ 35-36.)

### III. Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.   Discussion**

    A.   Equal Protection Claim[12]

The Fourteenth Amendment's Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As recently summarized by the Court of Appeals for the Third Circuit:

> The Supreme Court has said that "the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). At bottom, the Equal Protection Clause requires equal

---

[12] Defendant argues that there is no constitutional right to the investigation or prosecution of another, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and that there is no "independent due process right to be free from a reckless investigation," *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020). The Court agrees. However, Plaintiff does not raise due process claims, but rather an equal protection claim, which is viable for the reasons explained in the text.

> treatment of "all persons similarly situated." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 125 (3d Cir. 2018) (quoting *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005)). "The Equal Protection Clause does not forbid classifications." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). But the distinctions between classes "must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

*Stradford v. Secretary Pa. Dep't of Corr.*, 53 F.4th 67, 73 (3d Cir. 2022).

Plaintiff alleges that she was discriminated against and treated differently than Solomon, who is not a member of her protected class, by Trooper Parente. In order to bring a successful § 1983 claim for the denial of equal protection, she must show that any disparate treatment was based upon her gender. *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citations omitted). "Generally, the question of whether a plaintiff was treated differently from others similarly situated is a fact question for the jury, but summary judgment is appropriate where it is clear that no reasonable jury could find the similarly situated prong met." *Balcom v. Figueroa*, 2022 WL 1126051, at *7 (W.D. Pa. Feb. 28, 2022) (citation omitted), *report and recommendation adopted as modified*, 2022 WL 950039 (W.D. Pa. Mar. 30, 2022). For purposes of equal protection, "similarly situated" does not mean "identically situated." Rather, persons are similarly situated when they are alike "in all relevant respects." *Nordlinger*, 505 U.S. at 10. *See also Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) ("courts conducting the 'similarly situated' inquiry 'should not demand exact correlation, but should instead seek relevant similarity.'") (citations omitted).

Plaintiff cites *Harvard v. Cesnalis*, 973 F.3d 190 (3d Cir. 2020), in support of her position that Plaintiff and Solomon were similarly situated for purposes of evaluating her claim. In *Harvard,* the Third Circuit Court of Appeals held that two men involved in an altercation, one white (Sutton) and one Black (Harvard), were similarly situated. The Third Circuit noted that

because their actions occurred during the same incident, they could be "easily compared side-by-side." *Id.* at 206. Thus, it concluded, the appropriate manner by which to evaluate the comparator issue was not to look at their individual actions but to consider whether a juror looking objectively at the incident would "think them roughly equivalent and protagonists similarly situated." *Id.* (internal citation omitted.)

Trooper Parente argues that the *Harvard* case is inapposite because it involved a matter of selective enforcement, that is, Harvard was investigated differently and arrested in a disparate manner from Sutton, the similarly situated party. Certainly, neither Plaintiff nor Solomon was subject to arrest or a citation, and Plaintiff does not contend that this is a case of selective enforcement. Notably, however, the *Harvard* opinion contains no limitation based on the nature of the equal protection claim at issue and Trooper Parente has not cited any authority that supports a conclusion that *Harvard's* analysis of the issue of similarly situated individuals is limited to a selective enforcement case.

The Court concludes that Plaintiff and Solomon, as ex-spouses who were subject to the same PFA, were similarly situated. Both were parties to a PFA in which one alleged violations by the other. Both were subject to an investigation of events related to possible PFA violations and both reported their version of the same events. Thus, because their actions occurred during the same incidents, they can be compared side-by-side.

It then becomes necessary to determine whether Plaintiff was subjected to disparate treatment based upon her gender. Viewing the facts in the light most favorable to Plaintiff as the non-moving party, the Court concludes that there are sufficient facts of record to support Plaintiff's claim that she was subject to discriminatory and unequal treatment by Trooper Parente based on her gender. She reported on two occasions to Trooper Parente that Solomon was

contacting her and threatening her in violation of the PFA. In addition to her own statements, she presented evidence in the form of emails and photos and the history of previous PFA violations by Solomon, including a threatening email that she received only three days before her first contact with Trooper Parente. During their first meeting, Trooper Parente declined to view a video of a prior incident involving Solomon after the PFA was entered and failed to obtain the details of any of the prior PFA violations. While disputed, according to Plaintiff, he told her: "You have to understand that this is an issue with the PFA and women, not men. Women get PFAs all of the time and they abuse the power of it because they use it as a way to try to get back at an ex." (PCSMF ¶ 70.)

After Plaintiff's first interaction with Trooper Parente, he contacted Solomon, who claimed that he did not send the emails and accused Plaintiff of sending them to herself. Trooper Parente made no effort to arrange for an interview of Solomon or further investigate how or why Plaintiff, who had obtained a PFA and had evidence of prior violations by Solomon, would send herself an email that included photos of herself from a distance. Instead, Trooper Parente took no action at all based on "conflicting" reports.

After Plaintiff reported to the PSP another email from Solomon in which he threatened to kill her, Trooper Parente first contacted Solomon rather than Plaintiff. Solomon again alleged that Plaintiff was sending these emails. Based solely on Solomon's claim, Trooper Parente demanded that Plaintiff bring him Solomon's computer. After he took her statement, he told her that he would not do anything to enforce the PFA, but if she was lying, he would arrest her for lying to law enforcement. Again, while claiming he didn't believe either one of them, he took no statement from Solomon, did not accuse him of lying or seek to obtain by warrant any electronic device in Solomon's possession. Instead, he obtained a search warrant for Plaintiff's home and a

14

second one to see if she was sending emails to herself. He has admitted that his investigation was an "outlier" as he had never had a "prolonged PFA violation."

Thus, the trier of fact could conclude that Trooper Parente rejected Plaintiff's submissions out of hand, did not investigate Solomon's history of PFA violations, downplayed her concerns (for example, indicating her that he did not view the photos as threatening and leaving Solomon's threats to kill her and to use a weapon out of his report) and falsely implied that he had to receive permission from the DA's Office to proceed with charging Solomon with multiple alleged PFA violations. Moreover, even when Solomon admitted to Trooper Parente that he entered Plaintiff's home to take his computer—in what could be a clear violation of the PFA—Trooper Parente took no action. And despite obtaining records from Google in response to the search warrant that was issued based on his assertion that Plaintiff, rather than Solomon, may have been lying, he took no steps to investigate this any further.

By contrast, Trooper Parente accepted Solomon's account at face value. He claimed that he had to "prove" that emails sent from Solomon's email address were sent by Solomon in order to arrest him, but this represents an application of the wrong standard. The evidentiary standard for probable cause "is significantly lower than the standard which is required for conviction." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (citation omitted). Indeed, as Trooper Parente acknowledged, arrests for PFA violations are normally made the same day as they are reported and without input from the District Attorney. And as explicitly stated in the PFA, an arrest for its violation can be made solely on the basis of probable cause.

Further, Trooper Parente applied for a search warrant to search Plaintiff's home for Solomon's laptop computer based solely upon Solomon's unsubstantiated claim that she had access to and used his computer. He never subjected Solomon to an in-person interview or asked

15

him to provide a written or recorded statement at any time. He spoke to Solomon, the accused, before speaking to Plaintiff, the alleged victim, about the January 2, 2021 email. He stated that the past PFA violations by Solomon were "not relevant" to his investigation.

Interestingly, Trooper Parente's subsequent actions were largely based on the unverified statements of the alleged perpetrator, Solomon. As Plaintiff notes, the application for a search warrant stated that it was based on a "false report to a law enforcement officer" and the affidavit of probable cause questioned how she was unable to see who took the photographs that were attached to the email allegedly sent by Solomon. The same affidavit omitted important facts, including Solomon's threat to kill her and to use a weapon to do so. This evidence further supports Plaintiff's claim of gender bias on the part of Trooper Parente. *See Harvard*, 973 F.3d at 206 (noting support for claim of racial bias when the defendant officer consistently referred to Sutton—the white comparator—as "the victim" and falsely suggested that Harvard had a prior criminal history). Notably, Trooper Parente also attempts to place responsibility for the delays and eventual decision not to arrest Solomon on the district attorney's office, even though he admitted that he did not need permission from that office to file charges against Solomon.

Simply put, in viewing the evidence in the light most favorable to the non-moving party, after telling Plaintiff that women abuse the power of PFAs to get back at their ex-spouses, Trooper Parente denigrated and ignored Plaintiff's evidence and concerns, took no action to investigate the alleged perpetrator while accepting his claims at face value and accused Plaintiff of making false statements. Thus, based on the evidence of record, a fact finder could conclude that Trooper Parente deliberately dismissed or declined to assess Plaintiff's evidence and charge Solomon based upon his alleged view that women abuse the power of the PFA to get back at their ex-spouses. In short, he treated two similarly situated individuals in a FPA dispute in a

disparate manner, and there is sufficient evidence to support a claim that it was based upon Plaintiff's gender. Thus, a jury will have to determine whether the actions of Trooper Parente denied Plaintiff equal protection in violation of her Fourteenth Amendment rights.

## V. Conclusion

For these reasons, the motion for summary judgment filed by Defendant will be denied. An appropriate order will be entered.


Dated:  May 9, 2024                                  /s/ Patricia L Dodge
                                                     Patricia L. Dodge
                                                     United States Magistrate Judge